**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DIONA PETTIGREW, | ) | CASE NO. 1:17-cv-01118 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Soc. Sec.*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Diona Pettigrew (hereinafter "Plaintiff"), challenges the final decision of

Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter

"Commissioner"), denying her applications for a Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

# I. Procedural History

On September 21, 2015, Plaintiff filed her applications for POD, DIB, and SSI, alleging a disability onset date of March 25, 2014. (Transcript ("Tr.") 266-274). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 174-209). Plaintiff participated in the hearing on January 20, 2017, was represented by counsel, and testified. (Tr. 43-93). A vocational expert ("VE") also participated and testified. *Id*. On March 2, 2017, the ALJ found Plaintiff not disabled. (Tr. 36). On May 5, 2017, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-6). On May 30, 2017, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 11-1 & 13-1).

Plaintiff asserts the following assignments of error: (1) the ALJ erred by not giving deference to the opinions of her treating physician and medical providers; (2) the ALJ erred by failing to grant appropriate weight to the opinions of mental health providers, and (3) the ALJ's analysis of her pain failed to take into consideration all pain factors. (R. 11-1).

2

## II. Evidence

**A. Relevant Medical Evidence**[1]

> **1.  Treatment Records**
>
> > **a. Physical Impairments**

Before the alleged onset date, on August 22, 2013, Plaintiff saw Nicholas Herrera, M.D., to "reestablish PCP," but Plaintiff had "no issues or complaints" at that time. (Tr. 551). On physical examination, Plaintiff was 5'2" tall and weighed 201 pounds with a BMI of 36.92. (Tr. 552). Her general appearance was "healthy, pleasant, alert, no distress;" examination of her heart, lungs, and abdomen were normal; and her extremities were normal. *Id*. Dr. Herrera diagnosed benign hypertension that was well-controlled, hyperlipidemia, smoking history, depression but she was "doing well," and back pain that was chronic per the patient's history with "[n]o alarming symptoms or exam **findings**." *Id*. (emphasis in original). Teaching physician Jeff Becker, M.D., reviewed the documentation and indicated he agreed with the assessment of the resident, Dr. Herrera. (Tr. 553).

On February 25, 2014, x-rays of Plaintiff's cervical spine revealed straightening of the cervical lordosis, degenerative changes, disc space narrowing at all levels except C2-C3 with marginal osteophytes at multiple levels, no definite acute fracture, slight retrolisthesis of C4 with respect to C5 and C5 with respect to C6, minimal foraminal encroachment on the right at C5-C6 and on the left at C4-C5 and C6-C7, intact odontoid, and prevertebral soft tissues were unremarkable. (Tr. 566). The same day, x-rays of Plaintiff's lumbar spine revealed mild lumbar

---

[1]  The recitation of the evidence is not intended to be exhaustive. It focuses primarily on the various opinions of record concerning Plaintiff's functional limitations as those are most relevant to the assignments of error raised.

levoscoliosis, degenerative changes of the lumbar spine although the disk spaces were preserved and vertebral body height was maintained with marginal osteophytes present at multiple levels. *Id*. Further, there was no definite acute fracture, slight anterolisthesis of L4 with respect to L5, and some sclerosis of the posterior elements at L4-L5 and L5-Sl. *Id*.

Between March 13, 2014 and May 5, 2014, Plaintiff attended physical therapy for back pain. (Tr. 465-491).

On October 23, 2014, Plaintiff saw Songqian Li, M.D. (Tr. 449-450). On physical examination, Plaintiff had tenderness to palpation along lumbar muscles, straight leg test bilaterally with pain to lower back. (Tr. 450). Dr. Li assessed back pain that was likely a lumbar sprain and noted Plaintiff may have some radiculopathy. (Tr. 451).

In November and December of 2014, Plaintiff attended physical therapy for a strained lumbar paraspinal muscle. (Tr. 440-448).

On March 30, 2015, Plaintiff was seen by Adam Margolius, M.D., for shoulder pain in connection with a fall nine days earlier. (Tr. 429). X-rays were negative. *Id*. He referred her to physical therapy for shoulder exercises, though plaintiff was reluctant stating that physical therapy had not helped her back pain. (Tr. 431).

On April 3, 2015, Sandra Hearn, M.D., diagnosed Plaintiff with right biceps tendinitis, likely rotator cuff tendinitis, and personal history of crack abuse (remote). (Tr. 426-428).

On September 28, 2015, plaintiff was seen by Kathryn A. Teng, M.D., and complained of uncontrolled back pain, asking for referral to pain management. (Tr. 682). Dr. Teng assessed back pain at L4-L5, uncontrolled, and prescribed a short supply of Vicodin until she can be seen in a pain management setting. (Tr. 684).

On October 28, 2015, nurse practitioner Anastasia Driscoll, noted tenderness in Plaintiff's

cervical spine but no bony tenderness. (Tr. 1006). Plaintiff exhibited decreased range of motion and tenderness in the lumbar spine. *Id*. Nurse Driscoll assessed left-sided low back pain with left-sided sciatica (primary encounter diagnosis), referred to pain management for evaluation, and prescribed Cyclobenzaprine, Hydrocodone, and Oxycodone. *Id*.

On December 28, 2015, clinical nurse specialist Ann M. Harrington recommended increased pain medication, referral to weight management, and an MRI of Plaintiff's lumbar spine at the patient's request. (Tr. 999).

On February 9, 2016, an MRI of Plaintiff's lumbar spine revealed "[m]ild-to-moderate lumbar arthropathy, most significant at the L4-L5 level." (Tr. 1109-1110, 1190).

On February 17, 2016, results from a pulmonary function study were normal. (Tr. 1090).

On February 22, 2016, Plaintiff received a left knee injection, which she received bilaterally in October of 2016. (Tr. 1145, 1269).

On April 14, 2016, Plaintiff was seen by Elena Gonzalez, M.D., who assessed dizziness and trigger finger, and referred Plaintiff to hand orthopedics for the latter. (Tr. 1118-1121).

On April 18, 2016, Plaintiff presented to the Emergency Room ("ER") with complaints of a cough, asthma, and pain in her left knee and right thumb. (Tr. 1167-1171). She indicated she was taking no medications for pain. (Tr. 1171). Thomas Collins, M.D., observed that "Pt appears to have typical exacerbation of asthma and appears clinically stable. Will start prednisone which may also benefit her chronic thumb and knee pain. No new falls/injuries, no not [sic] feel xrays indicated at this time. Advised to ice thumb after doing her therapy." (Tr. 1173).

On May 5, 2016, she was seen for a follow-up complaining of lower back (worse on the left) and left knee pain. (Tr. 1106-1107). Plaintiff had been denied an epidural steroid injection (EDSI) because she did not attend physical therapy. (Tr. 1107). Nurse Harrington recommended

5

continuing Gabapentin, referral to a weight management clinic, renewed physical therapy for back and knee pain, an x-ray, but no opiates. (Tr. 1111). Her impression included chronic neck and back pain with a radicular component, mild to moderate degenerative changes of the lumbar and cervical spine, and left knee pain and swelling consistent with osteoarthritis. (Tr. 1110).

On May 18, 2016, an x-ray of Plaintiff's left knee later revealed "suprapatellar effusion, [but] otherwise normal knee radiographs." (Tr. 1188).

On May 19, 2016, x-rays of Plaintiff's hands/wrists showed "[m]inor spurring from the base of the distal phalanx of the 3rd left finger, [but] otherwise normal right and left hand." (Tr. 1186).

On August 29, 2016, physician's assistant Kathryn Wozniak wrote a letter stating that Plaintiff had surgery on her right hand on July 22, 2016, and was scheduled for surgery on her left hand on September 16, 2016. (Tr. 1258). She indicated that Plaintiff "will need to be excused from work for a period of 6 weeks after her second surgery. *Id*. The surgeries occurred as indicated/scheduled. (Tr. 1259-1260, 1282).

On September 15, 2016, Plaintiff went to the ER complaining of bilateral knee and lower back pain. (Tr. 1303-1305). On physical examination, her knees were normal and she appeared to be in no distress. (Tr. 1308).

On September 16, 2016, Plaintiff reported that she had right wrist pain at the surgical incision site, and reported that occupational therapy was not helping after 3 of 4 visits were completed. (Tr. 1282).

On October 19, 2016, occupational therapist Catherine Szado listed her prognosis for therapy as "[g]ood" following Plaintiff's surgeries (Tr. 1259-1263).

On October 26, 2016, an MRI of Plaintiff's left knee revealed a medial meniscus tear and

arthritic changes in the medial compartment. (Tr. 1292). An MRI of her right knee showed degenerative changes. (Tr. 1296).

### b. Mental Impairments

On October 31, 2013, prior to her alleged onset date, Plaintiff saw Nikona Thomas (qualifications not noted) for a mental status exam, which revealed Plaintiff was well groomed, had no hallucinations and was not delusional, had logical thought process, depressed mood, full affect, no reported impairment, and above average intelligence. (Tr. 602-603). On April 11, 2014, Plaintiff was seen by advanced practice nurse Ellen Alaimo, who assessed recurrent depression and complaints of mood swings. (Tr. 625). On October 16, 2014, advanced practice nurse Elizabeth Petitt noted Plaintiff was 5'2" tall and weighed 215 pounds. (Tr. 627). She also noted the presence of the following diagnoses stemming from November of 2013: major depressive disorder, single episode, moderate; and post-traumatic stress disorder (PTSD). (Tr. 626).

On July 23, 2015, advanced practice nurse Jeffrey Sims saw Plaintiff, who presented as "flat and somewhat solemn." (Tr. 663). Nurse Sims adjusted Plaintiff's medications after reports of uncontrollable crying and periodic sadness. (Tr. 662). On August 20, 2015, Plaintiff saw nurse Sims, complaining of stressors such as helping care for he mother who recently was released from rehabilitation and trouble obtaining disability benefits. (Tr. 668). She reported no adverse effects from her medications. *Id*. On September 17, 2015, Plaintiff reported to nurse Sims that her medication was working and denied side effects. (Tr. 1031). Nurse Sims noted that Plaintiff was "sullen and sad" because she was denied disability benefits. *Id*. He assessed a Global

Assessment of Functioning ("GAF") score of 55, indicative of moderate symptoms. (Tr. 1028).[2]

On September 30, 2015, Plaintiff related to nurse Sims that she was "somewhat sad based on a recent death in her family." (Tr. 1037). She stated that her medication was working but that she was gaining weight. *Id*. Nurse Sims again assessed a GAF score of 55. (Tr. 1034).

On November 12, 2015, Plaintiff was seen by registered nurse Tonya Moultrie, who noted that Plaintiff "is having a financial crisis and she is worried about getting her SSI," which may be contributing to her depression. (Tr. 1054). She also saw nurse Sims, who noted Plaintiff was sad, tearful, and reported anxiety attacks and crying spells. (Tr. 1062-1063). Nurse Sims, in reviewing Plaintiff's medication profile, believed that she may have stopped taking her medication, although Plaintiff adamantly denied it. (Tr. 1063). Nurse Sims again assessed a GAF score of 55. (Tr. 1060).

On December 30, 2015, Plaintiff told nurse Sims that her mother had died two weeks earlier. (Tr. 1082). The note indicates Plaintiff "was depressed but due to a stressor." *Id*. Plaintiff had a job interview that day, which she planned to attend. *Id*. Plaintiff told nurse Sims that she did not want any changes to her medication. *Id*. Nurse Sims again assessed a GAF score of 55. (Tr. 1079).

On January 28, 2016, nurse Sims noted that Plaintiff had "a long standing history of

---

[2] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates *moderate* symptoms or *moderate* difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *Id*. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

Depression," had a "recent stressor of the death of her mother," was "unemployed and has lost financial support with her mother's death," and reports experiencing insomnia, anxiety, and bad dreams." (Tr. 1198).

On February 26, 2016, Plaintiff saw consultative examining psychologist Herschel Pickholtz, Ed.D, for a mental status evaluation. (Tr. 1095-1103). Dr. Pickholtz found Plaintiff was "not a reliable and accurate respondent and informant." (Tr. 1103). Plaintiff stated that she could not work because of "[b]ack problems and I cannot drive because I hit a man and knocked him down." (Tr. 1096). The doctor opined that her symptoms appear to be in partial remission, and her residual symptoms appear to be mild to moderate at worst. (Tr. 1101). Dr. Pickholtz stated that:

> She was very difficult to assess as she would not speak up and oftentimes would not answer my questions directly. There was a discrepancy in the quality and quantity of her responses during the clinical interview which fell at least within the borderline range and her responses to the cognitive section of the evaluation which fell within the extremely low range of functioning.
>
> ***
>
> The impact of her current psychiatric complaints relative to work functioning comparable to the type of work she did in the past is difficult to assess due to tendencies towards exaggeration. However, I do believe with her current psychiatric, support, and medications it is somewhat impaired but not preclusive of work as long as she stays on her medications and doesn't return to cocaine usage.

(Tr. 1101-1102). Dr. Pickholtz diagnosed mild to moderate unspecified depressive disorder in partial remission; cocaine use disorder, severe, in remission; uncomplicated bereavement, and tendencies toward exaggeration. (Tr. 1102). Dr. Pickholtz's functional assessment is set forth below.

On March 3, 2016, Plaintiff told nurse Sims that she continued to have "a lot of stressors,

9

most recently a string of deaths: mom, sister in law, cousins, etc." (Tr. 1232). Plaintiff acknowledged that it was hard to determine whether she had an increase in depressive symptoms or was just dealing with symptoms of grief. *Id*. She also reported struggling with the disability appeal process. *Id*. She indicated she was trying to find a job and takes care of her autistic granddaughter (Tr. 1233, 1242).

On March 31, 2016, Plaintiff saw nurse Alaimo, and reported being upset because she was denied SSI and her mother passed away several months earlier. (Tr. 1214). She feared eviction, as she had been living off her mother's income. *Id*. On June 1, 2016, Plaintiff informed nurse Alaimo that she was fired from a telemarketing job after one month based on performance, and she felt discouraged and depressed. (Tr. 1204).

**2. Medical Opinions Concerning Plaintiff's Functional Limitations**

**a. Limitations based on Physical Impairments**

On May 19, 2014, resident in training, Dr. Herrera, completed a checklist medical statement and a pain questionnaire. (Tr. 363-364). In the medical statement, he listed Plaintiff's diagnoses as chronic lower back pain, cervical spondylosis without myelopathy, and hand osteoarthritis. (Tr. 363). Dr. Herrera opined that Plaintiff could work one hour per day; could stand for 30 minutes at a time but for less than 60 minutes total in a workday; sit for 2 hours at a time and no more than a total of 2 hours in a workday; and lift 10 pounds occasionally and less than 5 pounds frequently. (Tr. 363). Plaintiff could never stoop or work around dangerous equipment; could occasionally bend, balance, and perform fine manipulation bilaterally; and frequently perform gross manipulation bilaterally, raise her arms over her shoulder, and operate a motor vehicle, and

tolerate heat, cold, dust, smoke, fumes, noise exposure, and heights.[3] *Id*. She needed to occasionally elevate her legs above her waist during an eight-hour workday. *Id*. Dr. Herrera rated Plaintiff's pain as severe and estimated she would need to miss work more than three times per month. *Id*. In the accompanying pain questionnaire, Dr. Herrera summarized Plaintiff's subjective complaints as "severe hand pain, back pain, difficulty ambulating." (Tr. 364). The forms were not countersigned by a teaching or supervising physician.[4] *Id*.

On November 11, 2015, David Knierim, M.D., a state agency medical consultant, found there was insufficient evidence to evaluate Plaintiff's physical impairments. (Tr. 126-127).

On May 5, 2016, nurse Harrington completed a checklist physical medical source statement. (Tr. 1104-1105). She indicated Plaintiff could lift 16 pounds occasionally and 11 pounds frequently based on an "office test." (Tr. 1104). Nurse Harrington indicated that Plaintiff's ability to stand/walk and to sit were affected by her impairments, but did not specify her functional capabilities. *Id*. She did, however, note that Plaintiff was undergoing a work-up for new onset knee pain. *Id*. She further indicated Plaintiff could occasionally climb, balance, stoop, crouch, kneel, and crawl. *Id*. She could frequently reach, push, pull, and perform fine and gross manipulation (Tr. 1105). She was restricted in her exposure to heights and pulmonary irritants. *Id*. Nurse Harrington indicated that Plaintiff had been prescribed a cane, brace, and TENS unit, and needed to alternate at will between sitting, standing, and walking. *Id*. Finally, nurse Harrington indicated that Plaintiff subjectively reported severe pain, which would interfere with her ability to concentrate, take her off task, and cause absenteeism. *Id*.

---

[3] The terms occasionally and frequently are undefined by the form. (Tr. 363).

[4] On June 16, 2014, Songqian Li, M.D., noted that "Dr. Herrera is graduating." (Tr. 457, 717, 865).

11

### b. Limitations Based on Mental Impairments

On May 19, 2014, in response to a question on a form asking whether there was a psychological component to Plaintiff's pain, resident in training Dr. Herrera wrote that Plaintiff "has depression / [illegible] but [illegible] are reasonably controlled." (Tr. 364).

On September 30, 2015, nurse Sims completed a mental medical source statement. (Tr. 351-353). He assessed a moderate limitations in Plaintiff's ability to understand, remember and carry out short and simple instructions and to make judgments on simple work-related decisions; a marked impairment in the ability to understand, remember, and carry out complex instructions; and an extreme impairment in the ability to make judgments on complex work-related decisions. (Tr. 351). He assessed moderate limitations in Plaintiff's ability to interact appropriately with the public, supervisors, and coworkers, and in the ability to respond appropriately to usual work situations and changes in a routine work setting. (Tr. 352). When asked to identify the factors supporting his assessment, nurse Sims wrote, "information received from internal medicine practitioner" (Tr. 352).

On November 12, 2015, Karla Voyten, Ph.D., a state agency psychological consultant, found there was insufficient evidence to evaluate Plaintiff's alleged mental impairments. (Tr. 133).

On February 26, 2016, consultative psychologist Dr. Pickholtz interviewed Plaintiff and opined that Plaintiff's ability to understand, remember, and carry out instructions for work comparable to her past work were "slightly impaired at worst" and are "difficult to assess due to her exaggeration." (Tr. 1102). With respect to maintaining attention and concentration, Dr. Pickholtz opined that while "her capacities for attention and concentration based upon her responses to the evaluation fell within the extremely low range of functioning," those responses

were "inconsistent with her daily activities and abilities to understand and remember written and verbal information, suggestive of exaggeration." (Tr. 1102) He found that "[h]er abilities to perform 1 to 3-step tasks comparable to the type of work she did in the past with her current medications and ongoing support are somewhat impaired at worst but not preclusive of work with appropriate motivation." *Id*. Dr. Pickholtz found her capacity to respond to supervision and relate to coworkers are "difficult to assess due to tendencies toward exaggeration," but noted Plaintiff did not have a lot of problems relating to family members. *Id*. Similar problems assessing Plaintiff's ability to respond to work pressures were noted, but Dr. Pickholtz opined that, based on her daily activities and other interview responses, her impairment did not preclude work as long as she remained sober, took her medications, and continued with therapy. (Tr. 1103).

On March 9, 2016, Courtney Zeune, Psy.D., a state agency psychological consultant, adopted the mental RFC findings from the prior ALJ decision dated March 24, 2014, pursuant to the *Drummon*d ruling, explaining that there was no new/material evidence. (Tr. 148, 163).

On June 1, 2016, nurse Alaimo completed a checklist medical source statement concerning Plaintiff's mental capacity. (Tr. 1196-1197). She listed Plaintiff's diagnoses as recurrent depression and comorbid medical problems (Tr. 1197). In the area of making occupational adjustments, she indicated that Plaintiff could occasionally follow work rules, maintain attention and concentration for extended periods of two-hour segments, respond appropriately to changes in routine settings, deal with the public, relate to coworkers, interact with supervisors, function independently without redirection, deal with work stress, complete a normal workday and workweek without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 1196). However,

13

she could rarely maintain regular attendance and be punctual within customary tolerance. *Id*. In the area of intellectual functioning, Plaintiff could occasionally understand, remember, and carry out detailed to complex job instructions. (Tr. 1197). In the area of making personal and social adjustment, she could occasionally socialize, behave in an emotionally stable manner, and leave home on her own. *Id*.

On November 14, 2016, nurse Alaimo completed a second checklist mental medical source statement. (Tr. 1300-01). She listed Plaintiff's diagnoses as recurrent depression and PTSD. (Tr. 1301). She opined Plaintiff could occasionally maintain attention and concentration for extended periods of 2 hour segments, maintain regular attendance and be punctual within customary tolerances, deal with the public, work in coordination with or proximity to others without being distracted or distracting, deal with work stress, and complete a normal workday/workweek without interruption from psychologically based symptoms. (Tr. 1300). In the area of intellectual functioning, Plaintiff could constantly or frequently perform all tasks. (Tr. 1301). In the area of making personal and social adjustment, Plaintiff could occasionally behave in an emotionally stable manner and relate predictably in social situations. *Id*.

**B. Relevant Hearing Testimony**

At the January 20, 2017 hearing, Plaintiff testified as follows:

- She is 5'2" tall and weighs 207 pounds (Tr. 52).

- She lives in an apartment with her 19-year-old daughter and 10-year-old granddaughter, who is autistic. She lives off of the $735 monthly disability payment received for her granddaughter and food stamps. (Tr. 52-53).

- She has not used cocaine in 20 years. (Tr. 55).

- She has an associate's degree in business administration. (Tr. 55).

- She tries to read the Bible a lot, but her right hand hurts, her eyes bother her, and she has difficulties with comprehension. (Tr. 56).

- Since her alleged onset date, she worked for DirecTV for a week and a half, but was fired for performance issues. (Tr. 57).

- She cannot stand longer than 15 minutes without her back giving out, and her hands have not completely healed from her surgeries. (Tr. 58).

- Since her previous claim was denied, her knees have gotten worse and she requires cortisone shots every three months, she has had surgery on both hands, she is on medication to stop her from crying, and she cannot stand for more than five to ten minutes. She has fallen a number of times. (Tr. 71-72). She has also been prescribed a cane as well as knee braces.[5]  (Tr. 73).

The ALJ found that the following jobs qualified as past relevant work: telemarketer,

psychiatric aide, fast food manager, and customer service representative. (Tr. 85). The ALJ

posed the following hypothetical question to the VE:

> For the first hypothetical, please consider an individual with the same age, education, past work as Ms. Pettigrew who can perform a range of light exertional work subject to the following. This person can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can sit, stand, or walk for six hours each for an eight hour workday; she can occasionally climb ramps or stairs and occasionally balance, stoop, kneel, crouch, or crawl; however, she cannot climb ladders, ropes, or scaffolds. This person must avoid hazards such as unprotected heights and moving mechanical machinery, and she cannot perform commercial driving. This person can perform no more than frequent handling, fingering, feeling; she can operate foot controls on a frequent basis; she can tolerate no more than frequent exposure to extreme cold, extreme heat, humidity, witness, dust, orders, fumes, and pulmonary irritants; she can tolerate frequent interaction with supervisors, coworkers, and members of the general public and relate with others on a superficial basis; and she can tolerate a work environment that is not include strict production requirements or fast pace.

(Tr. 85-86).

The VE testified that such an individual could perform the telemarketer job and the

---

[5] Counsel conceded that the prescription for the cane is not contained in the record. (Tr. 83).

customer service representative job. (Tr. 86). The VE further identified the following jobs as representative examples of work that the hypothetical individual could perform: office helper, Dictionary of Occupational Titles ("DOT") 239.567-010, light, unskilled, SVP of 2 (90,000 jobs nationally); mail clerk, DOT 209.687-026, light, unskilled, SVP of 2 (90,000 jobs nationally); copy machine operator, DOT 207.685-014, light, unskilled, SVP of 2 (55,000 jobs nationally). (Tr. 86).

The ALJ posed a second hypothetical asking the VE to assume the same hypothetical person but who can "only lift and/or carry 10 pounds occasionally and less than 10 pounds frequently some, she can sit for six hours in an eight-hour workday as well as stand and/or walk for two hours in an eight-hour workday." (Tr. 87). The VE testified that the telephone solicitor and customer service representative jobs again remained. (Tr. 87). The VE further identified the following jobs as representative examples of work that the hypothetical individual could perform: charge account clerk, DOT 205.367-014, sedentary, unskilled, SVP of 2 (65,000 jobs nationally); bench assembler, DOT 713.687-026, sedentary, unskilled, SVP of 2 (100,000 jobs nationally); and, surveillance system monitor, DOT 375.367-010, sedentary, unskilled, SVP of 2 (60,000 jobs nationally). *Id.*

The ALJ proceeded to inquire about the impact of a limitation to simple, routine tasks and only simple work-related decisions to the previous hypotheticals. (Tr. 88). The VE responded that such limitations would eliminate all past relevant work, but the previously identified jobs would remain. (Tr. 88).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of*

16

*Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

17

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since March 25, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine; obesity; bilateral knee degenerative joint disease with medial meniscal tear of the left knee; history of right biceps tendinitis; lumbar levoscoliosis; asthma; history of bilateral carpel tunnel syndrome and releases; history of DeQuervain's Syndrome status-post surgery September 2016; status-post thumb trigger finger release July 2016; diabetes mellitus; minor spurring of the left 3rd finger distal phalanx; depression; and posttraumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can sit, stand, or walk for 6 hours each per 8-hour workday; she can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch and crawl; she cannot climb ladders, ropes or scaffolds; she must avoid hazards such as unprotected heights and moving mechanical machinery; she cannot perform commercial driving; she can perform no more than frequent handling, fingering and feeling; she can operate foot controls on a frequent basis; she can tolerate no more than frequent exposure to extreme cold, extreme heat, humidity, wetness, dust, odors, fumes, and pulmonary irritants; she can tolerate frequent interaction with supervisors, coworkers and members of the general public; she can relate with others on a superficial basis; she can tolerate a work environment that does not include strict production requirements or fast pace; and she requires the ability to use a cane while ambulating.

6.  The claimant is capable of performing past relevant work as a
    Telemarketer, DOT# 299.357-014, which is sedentary and SVP of 3 and
    Customer service representative, DOT# 239.362-014, which is sedentary
    with an SVP of 5. This work does not require the performance of work-
    related activities precluded by the claimant's residual functional capacity
    (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social
    Security Act, from March 25, 2014, through the date of this decision (20
    CFR 404.1520(f) and 416.920(f)).

(Tr. 21-35).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is

supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a

whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look

into any evidence in the record to determine if the ALJ's decision is supported by substantial

evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court

does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.

*Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ

failed to apply the correct legal standards or made findings of fact unsupported by substantial

evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).

Substantial evidence is more than a scintilla of evidence but less than a preponderance and is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned

even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B. Plaintiff's Assignments of Error**

**1. Treating Physician Rule**

In her first assignment of error, Plaintiff asserts that the ALJ violated the treating physician rule by failing to ascribe appropriate weight to the opinions of Dr. Herrera and clinical nurse specialist Harrington. (R. 11-1, PageID# 1386-1391).

The court finds that the treating physician rule is not implicated by the opinions of Dr. Herrera or nurse Harrington.[6] The Commissioner challenges Dr. Herrera's alleged status as a treating physician, arguing that "Plaintiff does not cite one treatment visit with Dr. Herrera during the relevant period. Nor does one appear in the record." (R. 13-1, PageID# 1425). The Commissioner is correct. Plaintiff points to no treatment in the record by Dr. Herrera, and the lone treatment record from Dr. Herrera uncovered by the court, dated August 22, 2013, predates the alleged onset date. (Tr. 551-553). As noted in the decision, a prior ALJ's decision from a

---

[6] Under the rules in effect at the time of the decision, nurse practitioners are not considered acceptable medical sources, as they are not listed as one of the five types of "acceptable medical sources," but rather are designated as "other sources." *Compare* 20 C.F.R. § 404.1513(a) with 20 C.F.R. § 404.1513(d); *see also Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) (finding the ALJ has the discretion to determine the appropriate weight to accord the opinion a non-medical "other source"). Nevertheless, while nurses are not "acceptable medical sources" under the regulations, Social Security Ruling 06–03p, 2006 WL 2329939 (Aug. 9, 2006) notes that information from "other sources" such as nurse practitioners "are important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* The Sixth Circuit has found that opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06–03P … the ALJ should have discussed the factors relating to his treatment of [nurse practitioner] Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion").

prior application found Plaintiff was not disabled as of March 24, 2014.[7] (Tr. 18). Furthermore, the court does not agree that Dr. Herrera qualified as a *treating* source at the time he rendered the opinion dated May 19, 2014. Plaintiff's brief identifies only one single examination predating the opinion. In addition, it would be of no consequence if Dr. Herrera rendered treatment *after* the opinion in question was authored, because "subsequent visits to [a physician] are irrelevant in determining whether the opinion was that of a treating physician *when it was completed*." *Witnik v. Colvin*, No. 14cv-257, 2015 WL 691329 at *5 (N.D. Ohio Feb. 18, 2015) (White, M.J.) (emphasis added). "The question is whether [the claimant] had the ongoing relationship with [the physician] to qualify as a treating physician *at the time he rendered his opinion*." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 506 (6th Cir. 2006) (emphasis added). In *Kornecky*, the Sixth Circuit declined to find a treating physician relationship, noting that visits to a physician *after* an assessment had been made "could not retroactively render [the doctor] a treating physician at the time of the assessment." 167 Fed. App'x at 506 n.10; *cf. Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485 (6th Cir. 2005) (finding that a physician who only saw the claimant twice was not a treating physician despite the ALJ referring to the physician as such).[8] Therefore, the court concludes that Dr. Herrera did not qualify as a treating source when

---

[7] A reference is made in the record that Plaintiff was seen by Dr. Herrera on March 4, 2014, and March 31, 2014, but no treatment nor progress notes appear in the record from those visits. (Tr. 892, 908). Elsewhere in the record, encounters between Dr. Herrera and Plaintiff on these same dates are characterized merely as telephone calls. (Tr. 483, 497). Complicating matters, a medical record from February 21, 2014, states that Plaintiff was last seen by Dr. Herrera on August 22, 2013, and was not scheduled to see him again until May 29, 2014 — ten days after he completed the disability forms. (Tr. 511, 514). If treatment did occur on those dates but has not been made part of the record, it is unclear how the ALJ could realistically be expected to consider an opinion well supported where the source's treatment notes are absent. Indeed, the ALJ reasonably found Dr. Herrera's opinion was "unsupported." (Tr. 29).

[8] Because Dr. Herrera was not a treating physician at the time the opinion was rendered but

he completed the checklist questionnaire.

Moreover, while the Commissioner has not specifically argued that Dr. Herrera was not a licensed physician when the opinion in question was rendered, the Commissioner expressly points out in her recitation of the facts that Dr. Herrera was "graduating" at some time after the disputed opinion was rendered. (R. 13-1, PageID# 1409). Other portions of the treatment record clearly indicate Dr. Herrera was being supervised by another physician. (Tr. 553). This reference to graduation naturally raises the question of whether Dr. Herrera was a licensed to practice medicine in the State of Ohio and whether his opinions constitute "medical opinions," or whether he can reasonably be construed as a "treating source."

Pursuant to the regulations, "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources…" 20 C.F.R. §§ 404.1527(a)(2) & 416.927(a)(2). Thus, in order to be considered a "medical opinion," a statement must come from an "acceptable medical source." To clarify any ambiguity in the regulations, Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006), states as follows:

> [O]nly "acceptable medical sources" can give us medical opinions. See 20 CFR 404.1527(a)(2) and 416.927(a)(2). Third, **only "acceptable medical sources" can be considered treating sources**, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 CFR 404.1527(d) and 416.927(d).

SSR 06-03p. 2006 WL 2329939 at *2 (emphasis added). In pertinent part, "acceptable medical

---

rather merely an examining source, his opinion is not subject to the rigors of the treating physician rule. "[T]he regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another." *Williams v. Colvin*, 2015 WL 5165458, at *5 (N.D. Ohio, Sept. 2, 2015) (*citing Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496 (6th Cir. 2006); *accord Chandler v. Comm'r of Soc. Sec.*, 2014 WL 2988433, at *8 (S.D. Ohio, July 1, 2014) ("the ALJ is not required to give 'good reasons' for rejecting a nontreating source's opinions in the same way as must be done for a treating source").

sources" are defined by the regulations as follows:

> (1) *Licensed* physicians (medical or osteopathic doctors);
>
> (2) Licensed or certified psychologists. Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only;

20 C.F.R. §§ 404.1513(a) and 416.913(a) (emphasis added).

At the time Dr. Herrera rendered his opinion on May 19, 2014, he had an "MD Training Certificate" from the State Medical Board of Ohio, as he did not become *licensed* as a "Doctor of Medicine" until August 27, 2014.[9] The application for a training certificate, which Dr. Herrera possessed when he completed the forms in question, expressly states:

> You are *not entitled to otherwise engage in the practice of medicine* and surgery or osteopathic medicine and surgery in this state.
>
> You must limit activities under the acknowledgement letter and training certificate to the programs of the hospitals or facilities for which the training certificate is issued.
>
> You may train only under the supervision of the physicians responsible for supervision as part of the training program.

*See* http://www.med.ohio.gov/Apply/Training-Certificate-MD-DO-DPM#PracticeLimits (last accessed April 2, 2018) (emphasis added).

Therefore, on the date Dr. Herrera completed the forms, he had only a training certificate, and was not a "licensed physician" (*i.e.* medical doctor or doctor of osteopathic medicine). Because Dr. Herrera was not an "acceptable medical source" when he authored the opinion, he

---

[9] *See* https://elicense.ohio.gov/oh_verifylicense. Further, the State Medical Board of Ohio's website contains separate links to applications for training certificates and to applications for medical (M.D.) or osteopathic medicine (D.O.) certificates. *See* http://www.med.ohio.gov/Application-Types

also cannot be construed as a treating source per SSR 06-03p. Consequently, the treating

physician rule is inapplicable to Dr. Herrera's opinion. At most, Dr. Herrera could be construed

as an "other source" under the regulations, which include "medical sources" who are not

designated as "acceptable medical sources," such as nurse practitioners, physicians assistants,

chiropractors, and therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d). This finding is consistent

with other decisions from this court. *See, e.g. Thurman v. Comm'r of Soc. Sec.*, No. 1:12-CV-

2034, 2013 WL 2358579, at *6 (N.D. Ohio May 29, 2013) (finding that because Dr. Ibrahim

"had a training certificate, he was not a 'licensed physician' under the regulations" and could

only be considered an "other" medical source);[10] *accord Honaker v. Colvin*, No. 1:14-CV-2487,

2015 WL 5559888, at *7 (N.D. Ohio Sept. 21, 2015) (agreeing with *Thurman* and finding Dr.

Awwad was not a "licensed physician" because he possessed only an MD Training Certificate

and, therefore, his opinion was not subject to the treating physician rule).

The opinions of "other sources" such as Dr. Herrera and nurse Harrington, however, should

be considered. SSR 06-3p states:

> Although there is a distinction between what an adjudicator must consider and
> what the adjudicator must explain in the disability determination or decision, the
> adjudicator generally should explain the weight given to opinions from these
> "other sources," or otherwise ensure that the discussion of the evidence in the
> determination or decision allows a claimant or subsequent reviewer to follow the
> adjudicator's reasoning, when such opinions may have an effect on the outcome of
> the case.

SSR 06-3p, 2006 WL 2329939 at *6. The ALJ addressed Dr. Herrera's opinion as follows:

> As for the opinion evidence, on May 19, 2014, Nicholas Herrera, M.D. opined
> that the claimant had severe pain, which frequently interfered with her
> concentration and attention (Ex. B6E/1l). Pursuant to 20 CFR 404.1527/416.927,
> if a treating source opinion is well supported by medically acceptable clinical and

---

[10] It bears noting that Plaintiff's counsel herein was counsel of record in *Thurman* and
participated in oral arguments on this very issue. (Case No. 1:12-cv-02034, ECF No. 18).

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, we will accord the opinion controlling weight. In this case, upon consideration of the evidence, I find Dr. Herrera's opinion is unsupported and inconsistent with the record as a whole. I gave little weight to this opinion. Specifically, his opinion was inconsistent with the claimant's own reported activities. The claimant reported that she took care of her hygiene daily (Ex. B9F/7). She changed her clothes four times a week. Her daughter washed her hair once a week. She did not vacuum, mop, or sweep the floors. She did not do the laundry. She shopped for food once a month with her daughter (Ex. B9F/8). She used the computer twice a month to look at pictures. She watched the news on television three times a week. She did not play any games. She said that she read the Bible. She said that she put her grandchild on the bus, ate, read and let her mother's aid do some chores. She said that she enjoyed reading and going to Church twice a month. She said that her other grandchildren visited her daily. She saw her daughter every Sunday.

(Tr. 29-30).

Here, the ALJ plainly satisfied the requirement that the opinion of an "other source" be considered, and spent a full paragraph explaining why Dr. Herrera's opinion was afforded little weight. Therefore, the ALJ carried out the duty to consider and generally explain the evidence from an "other source." To require greater articulation or to require that the ALJ give "good reasons" for rejecting the opinion of another source would impermissibly extend the scope of the treating physician rule.

With respect to the checklist opinion competed by nurse Harrington on May 5, 2016, (Tr. 1104-1105), the ALJ plainly identified her opinion and reiterated the limitations set forth therein. (Tr. 32). The ALJ noted that nurse practitioner's opinions are not considered the opinions of acceptable medical sources. *Id.* However, while the ALJ considered the opinion, the ALJ did not expressly explain the weight ascribed to the opinion, but it can be inferred that the ALJ rejected her opinion to the extent it conflicted with the RFC.

Nevertheless, to the extent any error resulted from the ALJ's failure to further articulate the weight accorded to nurse Harrington's opinion, the court finds any error harmless. Numerous

25

decisions have found that the use of checklist or check-the-box forms that contain little to no

accompanying explanation for the assessed limitations—even when utilized by a treating

physician or acceptable medical source—are unsupported opinions and, therefore, an ALJ may

properly reject source opinions contained in such forms.[11]  Another Sixth Circuit decision went

even further and determined that a check-box opinion, unaccompanied by any explanation, is

"'weak evidence at best' and meets our patently deficient standard." *Hernandez v. Comm'r of*

*Soc. Sec.*, 644 Fed. App'x 468, 475 (6th Cir. 2016) (*citing Friend v. Comm'r of Soc. Sec.*, 375

Fed. App'x 543, 551 (6th Cir. 2010)).[12]

    The *Hernandez* decision explained that "[e]ven if the ALJ erred in failing to give good

reasons for not abiding by the treating physician rule, it was harmless error" where the opinion in

---

[11] *See, e.g., Kepke v. Comm'r of Soc. Sec.*, No. 15-1315, 636 Fed. App'x 625, 2016 WL 124140, at *4 (6th Cir. Jan. 12, 2016) ("Dr. Chapman's checklist opinion did not provide an explanation for his findings; therefore, the ALJ properly discounted it on these grounds."); *accord Langlois v. Colvin*, No. 3:15-CV-01682, 2016 WL 1752853, at *8 (N.D. Ohio May 3, 2016) (Vecchiarelli, M.J.) (finding the ALJ did not err by rejecting a treating source's unexplained checklist opinion); *see also Hyson v. Comm'r of Soc. Sec.*, No. 5:12CV1831, 2013 WL 2456378, at *14 (N.D. Ohio June 5, 2013) (Burke, M.J.) (finding that because Dr. Martinez merely checked the boxes on the form while leaving those sections of the form blank where she was to provide her written explanation, she failed to provide any substantive basis for her conclusions and the ALJ was not required to accept her opinions); *see also Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("We have held that the ALJ may 'permissibly reject[] ... check-off reports that [do] not contain any explanation of the bases of their conclusions.'") (citations omitted); *Smith v. Astrue*, 359 Fed. App'x 313, 316 (3d Cir. 2009) ("checklist forms ... which require only that the completing physician 'check a box or fill in a blank,' rather than provide a substantive basis for the conclusions stated, are considered 'weak evidence at best' in the context of a disability analysis.") (citations omitted); *cf. Price v. Comm'r SSA*, 342 Fed. App'x 172, 176 (6th Cir. 2009) ("Because Dr. Ashbaugh failed to identify objective medical findings to support his opinion regarding [claimant's] impairments, the ALJ did not err in discounting his opinion.")

[12] The *Friend* decision identified three instances where a violation of the treating physician rule would be harmless error. 375 Fed. App'x at 551. The first instance, found applicable by the *Hernandez* court, was where "a treating source's opinion is so *patently deficient* that the Commissioner could not possibly credit it." *Id.* (emphasis added).

question was an unsupported check-box opinion. *Id.*; *accord Shepard v. Comm'r of Soc. Sec.*, No. 17-1237, 2017 WL 4251707, at *4 (6ᵗʰ Cir. Sept. 26, 2017) (finding that a doctor's "conclusory opinion, which provided no supporting findings or records and consisted largely of one word answers, circles, and check-marks" was suspect under *Hernandez*); *Toll v. Comm'r of Soc. Sec.*, No. 1:16cv705, 2017 WL 1017821 at *4 (W.D. Mich. Mar. 16, 2017) (finding that "even if the ALJ failed to provide good reasons" for assigning little weight to a treating source's opinion, such error was harmless where the opinion consisted of a check-box worksheet lacking any explanation beyond a diagnosis); *Denham v. Comm'r of Soc. Sec.*, No. 2:15cv2425, 2016 WL 4500713, at *3 (S.D. Ohio Aug. 29, 2016) ("The magistrate judge also correctly found that any error in the ALJ's consideration of Lewis's evaluation was harmless because the check-box form was so patently deficient that the Commissioner could not possibly credit it," and observing that "[t]he Sixth Circuit has cast doubt on the usefulness of check-box forms where the physician fails to give any explanation for his findings.").13 *cf. Herzog v. Comm'r of Soc. Sec.*, No. 2:16-CV-244, 2017 WL 4296310, at *3 (S.D. Ohio Sept. 28, 2017) (disagreeing with a report and recommendation which determined it was error for an ALJ to reject an opinion because it was given on a check-the-box, preprinted form—noting that while "there is no *per se* rule regarding this type of evidence, the Sixth Circuit has cast doubt on the usefulness of check-box forms where the physician fails to give any explanation for his or her findings.")

Nurse Harrington's May 2016 opinion mirrors the unexplained and unsupported

---

13 Moreover, another court aptly noted that a medical source statement, which was in a "check-box format," was "an impotent addition to the record with little to no persuasive value," and it was "immaterial" if there was certain evidence in the record consistent with the opinion "because the ALJ provided 'good reasons' for discounting his opinion and this Court may not reweigh the evidence." *Jackson v. Comm'r of Soc. Sec.*, No. 1:16-CV-14404, 2017 WL 4699721 at *7 (E.D. Mich. Oct. 19, 2017).

checklist/checkbox opinions disfavored in the above cited cases. As set forth in the recitation of the medical evidence, *supra*, the form completed by the nurse contains checked boxes devoid of any meaningful explanation for the limitations assessed. (Tr. 1104-1105). In fact, the form does not even contain a diagnosis that would suggest the conditions that cause the alleged limitations. *Id.* Where the form requests "the medical findings that support this assessment," nurse Harrington simply wrote "office test." (Tr. 1104). Given that the form does not contain a diagnosis—let alone any meaningful explanation as to how Plaintiff's symptoms would cause the alleged listed restrictions—the court deems the opinion "patently deficient." Therefore, any omission stemming from the ALJ's discussion of said opinion is harmless error.

Therefore, the court finds Plaintiff's first assignment of error is without merit.

**2. Weight Ascribed to the Opinions of Nurse Sims and Nurse Alaimo**

In the second assignment of error, Plaintiff argues that the ALJ should have granted more weight to the opinions of the mental health nurses, Mr. Sims and Ms. Alaimo, who saw her for treatment purposes. (R. 11-1, PageID# 1392-1396). Plaintiff asserts that the ALJ erred by ascribing greater weight to the opinion of Dr. Pickholtz, who saw Plaintiff only once, over the opinions of the nurses who saw Plaintiff on a regular basis. (R. 11-1, PageID# 1395).

The ALJ gave less than full weight to nurse Sims's opinion finding it was "not consistent with his own treatment records." (Tr. 30). The ALJ also gave little weight to the opinion of nurse Alaimo because "it was not consistent with the examination findings or opinion of Dr. Pickholtz who is an acceptable medical source" and because "it was inconsistent with the claimant's own reported activities." (Tr. 33). The ALJ, conversely, gave "great weight to Dr. Pickholtz." (Tr. 31).

Plaintiff concedes that Dr. Pickholtz was an "acceptable medical source" while the nurses

28

qualify merely as non-acceptable "other sources," but still maintains it was error for the ALJ to credit the former over the latter. (R. 11-1. PageID# 1395). Simply put, Plaintiff cites no authority that stands for the proposition that it is reversible error for an ALJ to credit the opinion of an examining and "acceptable medical source" such as Dr. Pickholtz over the opinion of an "other source" such as a nurse practitioner. Plaintiff's reliance on *Snell v. Comm'r of Soc. Sec.*, No. 3:12-CV-119, 2013 WL 372032, at *9 (S.D. Ohio Jan. 30, 2013), though a decision that is not binding on this court, is misplaced. Therein, the court noted that there is a "hierarchy of *acceptable* medical source opinions. The hierarchy begins at the top with treating physicians or psychologists, … [ne]xt in the hierarchy are examining physicians and psychologists, who often see and examine claimants only once," followed lastly by non-examining physicians. *Id.* (emphasis added). The *Snell* case does not suggest that an ALJ errs by crediting an examining psychologist over a source that does not even appear in the hierarchy of acceptable medical sources.

The remaining regulations and cases cited by Plaintiff are similarly inapposite. (R. 11-1, PageID# 1396). As discussed above, "[m]edical opinions are statements from physicians and psychologists or other *acceptable* medical sources.…" 20 C.F.R. §§ 404.1527(a)(2) & 416.927(a)(2) (emphasis added). Thus, the opinions of the nurses do not fall into the category of "medical opinions." Further, the ALJ expressly set forth the weight he ascribed to the opinions of Mr. Sims and Ms. Alaimo, and explained his reasons why.

Plaintiff's second assignment of error is, therefore, without merit.

### 3. Analysis of Plaintiff's Alleged Pain Symptoms

In her third assignment of error, Plaintiff contends that the ALJ failed to perform a proper pain analysis. Plaintiff contends that Social Security Ruling ("SSR") 16-3p, Evaluation of

Symptoms in Disability Claims, 2017 WL 5180304 (S.S.A. Oct. 25, 2017) applies to this action. The court agrees. By its express terms, it applies to "determinations and decisions on or after March 28, 2016."[14] (R. 11-1, PageID# 1397-1400). According to SSR 16-3p (as well as SSR 96-7p), evaluating an individual's alleged symptoms entails a two-step process that involves first deciding whether a claimant has an "underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms. *Id*. at *2-3. The ALJ's decision

---

[14] SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996). "The Sixth Circuit characterized SSR 16-3p … as merely eliminating 'the use of the word credibility . . . to clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Butler v. Comm'r of Soc. Sec.*, No. 5:16cv2998, 2018 WL 1377856, at *12 (N.D. Ohio, Mar. 19, 2018) (Knepp, M.J.) (*quoting Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 n.1 (6th Cir. 2016)). Like several other courts, this court finds little substantive change between the two, and the changes largely reflect a preference for a different terminology. *See, e.g., Howard v. Berryhill*, No. 3:16-CV-318-BN, 2017 WL 551666, at *7 (N.D. Tex. Feb. 10, 2017) ("having reviewed the old and new rulings, it is evident that the change brought about by SSR 16-3p was mostly semantic."). One decision has described the consistency of SSR 16-3p with SSR 96-7p particularly well:

> SSR 96-7p instructed the ALJ to "make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7P, 1996 WL 374186, at *2. It required the ALJ to give specific reasons for the weight given to the individual's statements, and prohibited the ALJ from making a conclusory statement that the individual's statements were considered and found not entirely credible. *Id*. at *4. Also, "the findings on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility." *Id.* Nothing in the text of SSR 96-7p suggests that the ALJ should consider an individual's character for truthfulness in evaluating her statements about her symptoms. *See Cole*, 831 F.3d at 412 ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants.").

*Patterson v. Colvin*, No. 13-CV-1040-JDB-TMP, 2016 WL 7670058, at *8 (W.D. Tenn. Dec. 16, 2016), *report and recommendation adopted*, 2017 WL 95462 (W.D. Tenn. Jan. 10, 2017). While the court applies the new SSR, it declines to engage in verbal gymnastics to avoid the term credibility where usage of the term is most logical. Furthermore, there is no indication that the voluminous case law discussing and applying the credibility or symptom analysis governed by SSR 96-7p has been invalidated by SSR 16-3p.

clearly found the first step was satisfied and states that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms." (Tr. 25). Once step one is satisfied, when considering the intensity, persistence, and limiting effects of an individual's symptoms, an ALJ should consider the following seven factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and, (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p at *4-8 (same factors as in SSR 96-7p).

However, an ALJ is not required to accept a claimant's subjective complaints. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *accord Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. App'x 162, 173 (6th Cir. 2016). "[C]redibility determinations with respect to subjective complaints of pain rest with the ALJ." *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987) ("[T]olerance of pain is a highly individual matter and a determination of disability based on pain by necessity depends largely on the credibility of the claimant," and an ALJ's credibility finding "should not lightly be discarded.") (citations omitted). Nevertheless, while an ALJ's credibility determinations concerning a claimant's subjective complaints are left to his or her sound discretion, those determinations must be reasonable and supported by evidence in the case record. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v.*

*Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) ("the ALJ must cite *some*

other evidence for denying a claim for pain in addition to personal observation"). "In evaluating

an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory

statement that 'the individual's statements about his or her symptoms have been considered' or

that 'the statements about the individual's symptoms are (or are not) supported or consistent.'"

SSR 16-3p at *10.[15] Rather, an ALJ's "decision must contain specific reasons for the weight

given to the individual's symptoms, be consistent with and supported by the evidence, and be

clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator

evaluated the individual's symptoms." *Id*. at *10. A reviewing court should not disturb an ALJ's

credibility "absent [a] compelling reason," *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001),

and "in practice ALJ credibility findings have become essentially 'unchallengeable.'" *Hernandez

v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (*citing Payne v. Comm'r of Soc.

Sec.*, 402 Fed. App'x 109, 113 (6th Cir. 2010)).

    The ALJ addressed the credibility of Plaintiff's alleged limitations in a lengthy discussion

of the evidence:

> I have considered all symptoms and the extent to which these symptoms can
> reasonably be accepted as consistent with the objective medical evidence and
> other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and
> SSR 96-4p. I have also considered opinion evidence in accordance with the
> requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and
> 06-3p.
>
> In considering the claimant's symptoms, I must follow a two-step process in
> which it must first be determined whether there is an underlying medically
> determinable physical or mental impairment(s)--i.e., an impairment(s) that can be
> shown by medically acceptable clinical and laboratory diagnostic techniques--that

---

[15]  SSR 16-3p merely replaced the term "credible" in this sentence from SSR 96-7p with the
terms "supported or consistent." 2016 WL 1119029 at *9.

could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant alleged an inability to perform full-time work due to depression, slipped discs, tendonitis, arthritis, upper/lower back injury, major depressive disorder, and DeQuervain tendonitis in both wrists, arthritis in the hands, chronic obstructive pulmonary disease and asthma (Ex. B2A/1).

In her Function Report, the claimant alleged that she could not sit, stand, use both hands or function mentally for longer than 15 minutes (Ex. B6E/2). She said that on a typical day, she took her medications and took a bath with assistance (Ex. B6E/3). She said that her 30-year-old daughter dressed her autistic granddaughter for school. She gave her mother her medications. She read the Bible, helped her 17 year old with dinner and homework and then went to bed. She stated that her mother who had a stroke lived with her and she had home health care eight hours a day, seven days a week. She said that her grown children helped the claimant care for her. She said that she woke up with pain in her back and legs. The claimant stated that her children took her where she needed to go (Ex. B6F/4). She said that she did some light cooking (Ex. B6E/5). She stated that she folded clothes and put away laundry. The claimant said that she did not like to be around people because they were "phony" and talked about her (Ex. B6E/6).

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. There were some gaps between the claimant's allegations of extensive and widespread limitations and her actual daily functioning. For example, despite her allegations, the claimant had full custody of and cared for her granddaughter with special needs. She also cared for her mother during the period in question.

While the claimant has consistently sought treatment, much of the treatment has been conservative in nature, and none of the objective or diagnostic findings of record were significant enough to match her allegations. Therefore, the claimant's

> allegations may not be reliable for determining her residual functional capacity. Following, a thorough review of the record, I find that the claimant can perform some of her positions of PRW, along with other jobs at Step 5 of the Sequential Evaluation.
>
> In terms of the claimant's alleged impairments, x-rays of the lumbar spine dated February 25, 2014 show mild lumbar levoscoliosis and degenerative changes of the lumbar spine (Ex. B2F/29).

(Tr. 25-26).

Plaintiff's argument sets forth some of the standards with respect to a pain analysis, but does not clearly pinpoint shortcomings in the ALJ's decision. Instead, Plaintiff's brief simply reiterates some of the medical evidence of record and suggests that, based on the evidence cited, the ALJ should have found greater limitations. (R. 11-1, PageID# 1397-1400). This is tantamount to an invitation for this court to reweigh the evidence and determine that it supports a finding that Plaintiff was more credible than determined by the ALJ. The court declines to do so, as this extends beyond the court's appropriate level of review. "When deciding under 42 U.S.C. § 405(g) whether substantial evidence supports the ALJ's decision, we do not try the case *de novo*, resolve conflicts in evidence, or *decide questions of credibility*." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (*quoting Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

The closest Plaintiff's brief comes to identifying a deficiency in the ALJ's credibility analysis is the ALJ's failure to specifically discuss pain medication in his credibility analysis. (R. 11-1, PageID# 1397). The ALJ does not specifically discuss pain medications in the credibility portion of his discussion (Tr. 25-26), but does note later in the opinion that "on September 15, 2016 for bilateral knee pain [during an ER visit for] lower back pain and a sinus infection (Ex. Bl8F/4)[,] [s]he said that she did not have any pain medications at home (Ex. Bl8F/5)."

Moreover, the above quoted portion of the decision reveals that the ALJ discussed several of the seven factors set forth in SSR 16-3p for finding Plaintiff less than fully credible. These included Plaintiff's daily activities, the conservative nature of the treatment of Plaintiff's pain inducing ailments, and the rather mild to moderate objective and diagnostic findings in comparison to the high levels of pain alleged by Plaintiff. (Tr. 25-26). Though some greater discussion of Plaintiff's pain medications and their efficacy would undoubtedly have been preferable, an ALJ is not required to analyze all seven factors, but should consider the relevant evidence. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (Baughman, M.J.) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence"); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005) (finding that neither SSR 96-7p nor the regulations "require the ALJ to analyze and elaborate on each of the seven factors when making a credibility determination"); *Wolfe v. Colvin*, No. 4:15-CV-01819, 2016 WL 2736179, at *10 (N.D. Ohio May 11, 2016) (Vecchiarelli, M.J.); *Allen v. Astrue*, No. 5:11CV1095, 2012 WL 1142480, at *9 (N.D. Ohio Apr. 4, 2012) (White, M.J.). SSR 16-3p itself states that where "there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor," but rather will only "discuss the factors pertinent to the evidence of record." *Id.* at *8. Furthermore, Plaintiff fails to offer any meaningful argument as to how greater discussion of her pain medications would have necessarily resulted in the conclusion that her pain allegations were more credible than found by the ALJ.

Given the high level of deference owed to an ALJ's findings with respect to the evaluation of a claimant's alleged symptoms and resulting limitations, under the circumstances presented herein, the court does not find the ALJ's pain analysis was insufficient. Thus, Plaintiff's final

assignment of error is without merit.

### IV. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be

AFFIRMED.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: June 4, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.** *See United States v. Walters,* **638 F.2d 947 (6th Cir. 1981);** *Thomas v. Arn,* **474 U.S. 140 (1985),** *reh'g denied,* **474 U.S. 1111 (1986).**